IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

BETA UPSILON CHI, UPSILON
CHAPTER AT THE UNIVERSITY
OF FLORIDA, a student organization
at the University of Florida on behalf
of itself and its individual members;  Case No.: 1:07-CV-135-SPM
and BETA UPSILON CHI, INC.,
a Texas nonprofit corporation,

    Plaintiffs,

vs.

J. BERNARD MACHEN, et al.,

    Defendants.
_____/

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

This cause comes before the Court upon the Plaintiffs' motion for preliminary injunction (docs. 47, 48), Defendants' response (doc. 63), Plaintiffs' reply (docs. 70, 88), and Defendants' response (doc. 83). A hearing on this matter was held on March 12, 2008. Upon review of all documents submitted and the arguments made by the parties at the hearing, for the reasons stated below, the preliminary injunction will be denied.

**I. Background**

Plaintiffs are Beta Upsilon Chi, Inc. the nation's largest Christian fraternity and Beta Upsilon Chi, Upsilon Chapter, the local chapter of the fraternity

(hereinafter known collectively as "BYX").  BYX currently has seven members at the University of Florida chapter.  Its purpose is to encourage members in their Christian faith, foster brotherhood and unity with like-minded Christian men, and teach members Christian leadership.

When new members apply, their acceptance in the fraternity is contingent upon the demonstration of a credible profession of faith in Jesus Christ and a desire to uphold the purpose of BYX.  Membership is contingent upon the completion of a pledge process.  The purpose of the pledge process is to examine the applicants' understanding of salvation, their personal relationship with Jesus Christ, and their willingness to adhere to guidelines of and work toward fulfilling the purpose of BYX.  During the interview segment of the pledge process, the applicants are asked questions about their Christian experience, Christian beliefs and willingness to adhere to the organization's Statement of Faith and to conform with the organization's Code of Conduct.  Applicants are denied membership if they disagree with BYX's Christian beliefs or are living a lifestyle that is inconsistent with Christian values as defined by BYX.  After successful completion of the pledge process, active members may stand for election to chapter leadership positions, vote for chapter officers, lead fraternity meetings, mentor new pledges, and hold other fraternity members accountable to living a lifestyle in accordance with BYX's Code of Conduct.

Defendants are the University of Florida, through its officers and trustees

2

(hereinafter known collectively as "UF").  UF's Nondiscrimination Policy prohibits discrimination on the basis of religion or creed.  The Student Handbook requires that all student organizations state in their organizational constitutions that they will not discriminate on the basis of race, creed, color, sex, age, national origin, or disability.  If the organization fails to comply, it will be prohibited from becoming a Registered Student Organization.  The benefits of being a Registered Student Organization are priority use of facilities on campus, eligibility to seek University funding, having access to bulletin boards in high traffic areas of campus, appearing in student organization lists in UF publications, and having a university-sponsored website and email address.  However, if an organization is not a Registered Student Organization, it is still permitted to use campus facilities, distribute literature on campus, and engage in speech activities on campus.

UF argues that BYX's requirement that its members believe in Jesus Christ is a violation of UF's Nondiscrimination Policy because it discriminates against non-Christians on the basis of religious belief or creed.  Furthermore, BYX has refused to state in its constitution that it will not discriminate on the basis of creed or religion.  Consequently, UF denied BYX's application for recognition as a Registered Student Organization.  BYX now seeks to enjoin UF from 1) enforcing UF's requirement that BYX's constitution include a statement that BYX will not discriminate on the basis of creed; 2) denying BYX the status of

a Registered Student Organization and the rights and privileges associated therewith; and 3) retaliating against BYX for exercising its constitutional rights.

**II.  Analysis**

A.  Standard for Preliminary Injunction

To obtain a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction were not granted, (3) that the threatened injury outweighs any harm an injunction may cause the defendant, and (4) that granting the injunction will not be adverse to the public interest. Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242,1246-47 (11th Cir. 2002). The "textbook definition" of a preliminary injunction is an order that was "issued to preserve the status quo and prevent allegedly irreparable injury until the court had the opportunity to decide upon issuing a permanent injunction." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1101 n.13 (11th Cir. 2004). A preliminary injunction is an "extraordinary and drastic remedy." Seigel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). This Court finds that BYX has not demonstrated a substantial likelihood of success on the merits. Because the motion for preliminary injunction fails on that first ground, the Court declines to evaluate the remaining three grounds.

B.  Expressive Associational Right

BYX's principal argument is that the UF's refusal to grant BYX's

application to become a Registered Student Organization violates BYX's First Amendment right to freedom of speech as an expressive association. Expressive association is the "right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984).  The courts have "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Id. at 622 (citations omitted).

"To determine whether a group is protected by the First Amendment's expressive associational right, [the court] must determine whether the group engages in 'expressive association.'" Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000).[1]  The mission of the Boy Scouts was to "serve others by helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential." Id. at 649.  The Court then concluded that it was "indisputable that an association that seeks to transmit a system of values engages in expressive activity." Id. at 650.

BYX is much like the Boy Scouts in that BYX's mission is to develop the

---

[1] Although this Court comes to a different result than the Court in Dale, the Dale case is instructive in the area of determining whether an organization has a First Amendment expressive associational right.

morality of its members and to help the members cultivate leadership traits that are based on a guiding belief in God.  Id.  Though the Boy Scouts were not a religious organization, they were similar to BYX in that they were both organizations who sought to develop certain personality characteristics through their interaction and engagement and fellowship with others within the organization.  Neither organization was interested in converting or ministering or influencing those outside of the organization.  Like the Supreme Court concluded in Dale, this Court concludes that BYX has substantially shown that it is seeking to share and transmit a system of values to its members and is therefore engaging in expressive activity that is protected by the First Amendment.

Following the analysis in Dale, the second step is to determine whether the forced inclusion of non-Christians in BYX would significantly affect BYX's ability to express itself–privately or publicly.   "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." Id. at 648 (citing New York State Club Assn., Inc. v. City of New York, 487 U.S. 1, 13 (1988)).  BYX's stated goal is to encourage the members in their Christian faith, foster brotherhood and unity with like-minded Christian men and teach members Christian leadership.  BYX has failed to show that the forced inclusion of a non-Christian in their group meetings or other functions will prevent BYX from encouraging their Christian

members in their faith, fostering unity with like-minded Christians, and teaching Christian leadership.  There has been no evidence that the mere presence of non-Christians in BYX will prevent the other members from fostering unity and encouraging each other in their Christian walk.  Therefore, BYX has not demonstrated that there is anything about the mere membership of non-Christians that would burden BYX's message or significantly affects BYX's "ability to advocate public or private viewpoints."[2]  Id.

Furthermore, the argument that the organization will be significantly burdened by UF's policy because it forces them to accept the leadership of those that do not believe what they believe is unfounded.  UF's Nondiscrimination Policy does not prohibit BYX from limiting its leadership positions to people who have demonstrated a credible profession of faith in Jesus Christ.  As a matter of fact, this is the policy of some of the religious organizations cited by BYX that are Registered Student Organizations.  Under UF's Nondiscrimination Policy BYX is free to consider the religious views of individuals who are candidates for leadership positions.  What UF's Nondiscrimination Policy does prohibit is a membership test based on religious beliefs.

BYX claims that UF's reliance on Pi Lambda Phi Fraternity, Inc. v.

---

[2] In Dale, the Court did find that retaining an active, avowed homosexual scout master who was also a vocal and outspoken gay rights activist would burden the organization's right to express its values.  Dale, 530 U.S. at 656. This case is distinguishable in that there is no actual person being considered for membership.  The right of BYX to reject an applicant who was a vocal and outspoken proponent of a lifestyle or ideology that is in oppostiion to what BYX believes is not before this Court.

University of Pittsburgh is misplaced because the Pi Lambda Phi's violation was unrelated to nondiscrimination policies.  229 F.3d 435 (3d Cir. Pa. 2000).  BYX further states that the deciding factor in Pi Lambda was the fact that the activities for which the fraternity was denied recognition was criminal drug activity.  Despite these differences, the Pi Lambda case is instructive.  The reason that the Third Circuit found that Pi Lambda's denial of recognition was not a violation of the associational right was not necessarily because of the criminal nature of the fraternity's behavior.  It was because Pi Lambda Phi violated university policy and because the University of Pittsburgh's was acting "out of non-ideological motives" in order to "directly restrict a group's non-expressive activity. . . ." Id. at 445.   Therefore, Pi Lambda, though not binding authority in this district, is indeed persuasive.

The motives of UF, like the motives of the University of Pittsburgh are not ideologically-based.  The decision of both universities to deny official recognition to their respective fraternities was the result of the fraternities violating University policy.  Id. at 445. ("In the case at bar, there is no doubt that the Chapter violated University rules, and Healy clearly contemplates the University's power to withdraw recognition from the Chapter without a constitutional violation of associational rights."  Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 445 (3d Cir. Pa. 2000).  In both cases, it was clear that university policy was violated.

Because this Court finds that BYX's adherence to UF's Nondiscrimination Policy does not pose a burden on BYX's expressive associational right, there is no need to continue the analysis followed in Dale and inquire into whether UF's interest implicated in denying Registered Student Organization Status to BYX outweighed "the burden imposed on the associational expression to determine if the state interest justified the burden."  Pi Lambda, 229 F.3d at 442 (citing Dale at 657).  BYX has failed to demonstrate a substantial likelihood that UF's Nondiscrimination Policy violates BYX's First Amendment rights or places a burden on BYX's First Amendment interests.  Therefore, there is no need for UF to advance a compelling or important interest upon which to justify its Nondiscrimination Policy.  Dale 530 U.S. at 569-70 (The Court used traditional First Amendment analysis to determine whether the state's interests are compelling, or at least important enough to justify a severe intrusion on the Boy Scouts' right to freedom of expression.) (citing Hurley v. Irish-American Gay Lesbian & Bisexual Group, 515 U.S. 557, 577).

B.   Viewpoint Discrimination

BYX's second claim is that it is the victim of viewpoint discrimination by UF as demonstrated by UF's refusal to grant BYX's application for Registered Student Organization status but accepting the application of other groups that have different viewpoints.  "[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses

on an otherwise includible subject." <u>Cornelius v. NAACP Legal Def. & Educ. Fund</u>, 473 U.S. 788, 806 (1985).

> Discrimination against speech because of its message is presumed to be unconstitutional . . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

<u>Rosenberger v. Rector and Visitors of Univ. of Va.</u>, 515 U.S. 819, 828-829 (1995) (citation omitted). BYX's evidence of this viewpoint discrimination is the fact that UF allows other religious (Christian and non-Christian) groups to be registered, but it refuses to extend this benefit to BYX. UF's response is that the other religious groups adhere to the university guidelines for student organizations because they do not discriminate on the basis of religious belief or creed and BYX does.

Other organizations whose applications were approved have policies that allow general membership to be open to people of all creeds and religions. Additionally, their willingness to include nondiscrimination language in their constitutions brings them into compliance with UF's Nondiscrimination Policy. It is the conduct of these other organizations that is different from BYX, not their viewpoint. The fact that there are some Christian organizations that have the same religious viewpoint as BYX and achieved the status of Student Registered Organizations demonstrates that BYX's "specific motivating ideology or the

opinion or perspective of the speaker" was not the rationale for UF's decision. Rosenberger, at 819. Therefore, this Court finds BYX has failed to prove that BYX is the subject of viewpoint discrimination.

### III. Conclusion

Because BYX has not yet demonstrated a violation of its constitutional rights, this Court holds that BYX does not have a substantial likelihood of success on the merits of its claim. Accordingly, it is ORDERED AND ADJUDGED that BYX's Motion for Preliminary Injunction (doc. 47) is hereby ***denied***.

DONE AND ORDERED this twenty-ninth day of May, 2008.

*s/ Stephan P. Mickle*
Stephan P. Mickle
United States District Judge