IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| BETA UPSILON CHI, UPSILON CHAPTER | ) | |
| AT THE UNIVERSITY OF FLORIDA, a student | ) | |
| organization at the University of Florida on | ) | |
| behalf of itself and its individual members; *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 1:07-CV-135-SPM |
| | ) | |
| J. BERNARD MACHEN, in his official capacity | ) | |
| as President of the University of Florida; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFFS' MEMORANDUM IN SUPPORT
OF EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

COME NOW Plaintiffs Beta Upsilon Chi, Upsilon Chapter at the University of Florida

and Beta Upsilon Chi, Inc. and, pursuant to Fed. R. Civ. P. 62(c), Fed. R. App. P. 8(a)(1)(C), and

N.D. Fla. Loc. R. 7.1(A), hereby submit their Memorandum in Support of Emergency Motion for

Injunction Pending Appeal.

STATEMENT OF FACTS

Plaintiffs incorporate by reference the full Statement of Facts from their Memorandum in

Support of Motion for Preliminary Injunction. Plaintiffs nonetheless believe there is benefit to

highlighting some key facts.

A.       BYX's Members Control the Message and Direction of the Group.

The members of Beta Upsilon Chi, Upsilon Chapter at the University of Florida

("BYX") are more than mere attendees or participants. The members may stand for election to

chapter officer positions and vote for chapter officers. They share testimonies, provide words of

encouragement, or give Bible messages at Weekly Meetings.  They lead the group in worship and prayer, hold other members in Cell Groups accountable to living consistently with the group's Christian beliefs and values, mentor new pledges as part of the Big/Little Brother Program, and generally participate in the business of the fraternity, including helping with service projects and parties.  (First Hoyt Dec. ¶ 46; Verified Second Am. Compl. Ex. A at 1-9; Order Den. Mot. for Prelim. Inj. at 2.)

In short, the members are the students who control the group.  Thus, BYX believes that bestowing the privileges of membership on students who disagree with the group's Christian beliefs would significantly affect the group's ability to fulfill its purpose and mission. (Verified Second Am. Compl. ¶ 3.15; First Hoyt Dec. ¶ 3.)

B.     BYX Limits Participation in Its Core Functions to Officers and Members.

Many of BYX's activities, such as its service projects, the Island Party outreach event, and social events, are open to anyone regardless of their religious beliefs.  (Verified Second Am. Compl. ¶ 3.16; First Hoyt Dec. ¶ 30.)  However, the group's core functions are limited to officers and members—students who share the Christian beliefs and viewpoint of the fraternity.  These functions include the fraternity's Cell Groups and Weekly Meetings.  (First Hoyt Dec. ¶ 23; Verified Second Am. Compl. Ex. A at 9; First Peterman Dec. ¶ 15.)

BYX is organized around Cell Groups.  (First Hoyt Dec. ¶ 22.)  Cell Groups are weekly gatherings where the officers and members hold one another accountable to living consistently with the fraternity's Christian beliefs and values.  (First Hoyt Dec. ¶ 22.)  The officers and members of BYX are currently divided into two Cell Groups.  (First Peterman Dec. ¶ 15.)  All BYX members and pledges are required to participate in Cell Groups, since the groups are essential to achieving the fraternity's purpose of providing brotherhood and unity based on

Christ-centered relationships.  (First Hoyt Dec. ¶ 23; Verified Second Am. Compl. Ex. A at 9; First Peterman Dec. ¶ 15.)

At Weekly Meetings, the members and pledges gather together for prayer, worship, a time of encouraging a specific member, a testimony or Bible message from a fraternity member, and announcements pertaining to fraternity business. (First Peterman Dec. ¶ 17; First Hoyt Dec. ¶ 24.)  The meetings are designed to teach Christian faith, brotherhood, unity, leadership and character.  (First Peterman Dec. ¶ 17; First Hoyt Dec. ¶ 24.)  Weekly Meetings are closed to persons who are not chapter members or pledges, except one meeting per a semester is open to students contemplating rush activities and membership.  (First Hoyt Dec. ¶ 24.)

C.    UF's Uneven Application of Its Nondiscrimination Policy.

In order for BYX to register with the University of Florida ("UF"), it must both abandon its requirement that officers and members agree with the group's Christian beliefs and affirmatively include in its constitution the Nondiscrimination Statement from the University's Constitution Guidelines, which includes a pledge not to take a person's "creed" into account when determining membership or selecting leaders.  (Second Am. Compl. ¶¶ 4.11-4.14 & Ex. F at 18-19.)  According to UF, the purpose of the required Nondiscrimination Statement is to ensure that student organizations comply with the University's Nondiscrimination Policy, which provides in pertinent part that "[t]he University is committed to non-discrimination with respect to race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations, and veteran status as protected under the Vietnam Era Veterans' Readjustment Assistance Act."  (Verified Second Am. Compl. Ex. H at 1.)

The Nondiscrimination Statement, however, only requires student organizations to pledge in their constitutions that they "will not discriminate on the basis of race, creed, color, sex, age,

national origin, and disability." (Verified Second Am. Compl. ¶¶ 4.11-4.14 & Ex. F at 18.)   The

Nondiscrimination Statement specifically omits "religion," "marital status," "political opinions

or affiliations," and "veteran status," which are protected classes listed in the University's

Nondiscrimination Policy.  (Verified Second Am. Compl. ¶¶ 4.11-4.14 & Ex. F at 18.)  The

Constitution Guidelines also provide that "[i]t is preferred, but not required to include sexual

orientation" in a student organization's Nondiscrimination Statement.  (Verified Second Am.

Compl. ¶¶ 4.11-4.14 & Ex. F at 18.)  Additionally, UF regularly provides single-sex groups an

exemption from the "sex" portion of the Nondiscrimination Statement.  (Verified Second Am.

Compl. Ex. F at 10 & Ex. M at 2-3.)

UF also recognizes registered student organizations that discriminate on grounds

specifically prohibited by UF's Nondiscrimination Policy.  For example, the Baha'i Association

seeks members who assent to its religious principles and purposes.  (Verified Second Am.

Compl. Ex. E at 3; First Tracey Dec. Ex. A.)  Alpha Epsilon Pi is a Jewish fraternity that

mandates that members profess a belief in God.  (Verified Second Am. Compl. Ex. E at 2; First

Tracey Dec. Ex. B.)  Christian Pharmacists Fellowship International requires members to agree

with its Christian beliefs and to affirm faith in Jesus Christ.  (Verified Second Am. Compl. Ex. E

at 4; First Tracey Dec. Exs. C & D.)  The Albanian Student Association tells members they must

agree with the group's beliefs about Albanian culture.  (Verified Second Am. Compl. Ex. E at 2;

First Tracey Dec. Ex. E.)  The Fellowship of Christian of Athletes requires its "Servant Team" to

demonstrate Christian faith and commitment.  (Verified Second Am. Compl. Ex. E at 6; First

Tracey Dec. Ex. F.)  The Pro Life Alliance seeks members who will stand up for life. (Verified

Second Am. Compl. Ex. E at 12; First Tracey Dec. Ex. G.)

<u>ARGUMENT AND CITATION OF AUTHORITY</u>

The standard for granting an injunction pending appeal is similar to the standard for granting a preliminary injunction. *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000); *Weng v. U.S. Atty. Gen.*, 287 F.3d 1335, 1338 n.5 (11th Cir. 2002). The movant must show: (1) a substantial likelihood that they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest. *Touchston*, 234 F.3d at 1132; *In re Federal Grand Jury Proceedings*, 975 F.2d 1488, 1492 (11th Cir. 1992); *MacBride v. Askew*, 541 F.2d 465, 467 (5th Cir. 1976).

Although the first factor is generally the most important, the movant need not always show that it probably will succeed on the merits of the appeal. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). Instead, where the "balance of the equities weighs heavily in favor of granting the [injunction]," the movant need only show a "substantial case on the merits." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981); *see also United States v. Hamilton*, 963 F.2d 322, 323 (11th Cir.1992); *Garcia-Mir*, 781 F.2d at 1453.

Under Fed. R. App. P. 8(a)(1)(C), Plaintiffs are required to seek an injunction pending appeal from this Court before pursuing such relief in the Court of Appeals. "A party must ordinarily first move in the district court for an injunction pending appeal." *Gonzalez ex rel. Gonzalez v. Reno*, 2000 WL 381901, at *4 n.4 (11th Cir. Apr. 19, 2000).

I.      BYX Has a Substantial Likelihood of Prevailing on the Merits of its Appeal.

        A.      UF's Denial of Registration to BYX Violates BYX's Right of Expressive Association.

"While the freedom of association is not explicitly set out in the [First] Amendment, it

has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy v. James*, 408 U.S. 169, 181 (1972); *Roberts v. United States Jaycees,* 468 U.S. 609, 622 (1984). "The right of expressive association . . . is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms." *McCabe v. Sharret,* 12 F.3d 1558, 1563 (11th Cir. 1994). According to the Eleventh Circuit, "expressive association rights are considered fundamental." *Id.*

> 1.     BYX is an expressive association.

This Court in its Order Denying Motion for Preliminary Injunction held that BYX was an expressive association. (Order Den. Mot. for Prelim. Inj. at 6.) BYX had "shown that it is seeking to share and transmit a system of values to its members and is therefore engaging in expressive activity that is protected by the First Amendment." (Order Den. Mot. for Prelim. Inj. at 6.) As the Court notes, this holding is compelled by *Boy Scouts of America v. Dale,* 530 U.S. 640 (2000), where the Scouts were found to be an expressive association because they sought to instill values in young people through instruction and activities, like camping and fishing. *Id.* at 649-50.

BYX similarly seeks to instill certain values in its members, specifically the Christian beliefs and morals reflected in the group's Statement of Faith, Code of Conduct, and Constitution. (First Hoyt Dec. ¶¶ 6, 7; Verified Second Am. Compl. Ex. C & Ex. D.) BYX's officers teach members these values at the Weekly Meetings and retreats. (First Hoyt Dec. ¶ 46; Verified Second Am. Compl. Ex. A at 1-9.) The members also encourage these values in one another through the Cell Groups, prayer times, fellowship events, and the testimonies and Bible messages shared at Weekly Meetings. (First Peterman Dec. ¶¶ 7, 17; First Hoyt Dec. ¶¶ 22, 24, 25, 29-30.) The values are also reinforced by the service projects and alcohol and drug-free

social events that BYX regularly hosts.  (First Hoyt Dec. ¶¶ 29-30.)  The pledge process is

designed to build Christ-like character and to promote spiritual growth in the pledges'

commitment to Christ.  (First Hoyt Dec. ¶ 42; Verified Second Am. Compl. ¶ 3.12 & Ex. A at 5-

6.)  As the Court determined, BYX is indisputably "engaging in expressive activity that is

protected by the First Amendment."  (Order Den. Mot. for Prelim. Inj. at 6.)

> 2.  Forced inclusion of members who reject BYX's religious
>      convictions significantly impairs its expressive association.
>
>      i.  UF requires BYX to offer actual membership to
>          non-Christians, not simply to permit attendance or
>          presence.

The Court in its Order held that "[t]here has been no evidence that the mere presence of

non-Christians in BYX will prevent the other members from fostering unity and encouraging

each other in their Christian walk."  (Order Den. Mot. for Prelim. Inj. at 6.)   But BYX's

contention has never been that "the mere presence of non-Christians" affects its expression.

Indeed, many of BYX's activities, such as its service projects, the Island Party outreach event,

and social events, are expressly open to non-Christians.  (Verified Second Am. Compl. ¶ 3.15;

First Hoyt Dec. ¶ 30.)

Instead, BYX's contention is that being forced as a condition of registration to bestow the

privileges of *membership* on students who reject its beliefs impairs its expression.  (Verified

Second Am. Compl. ¶ 3.15; First Hoyt Dec. ¶ 3.)  *Membership* is not simply "mere presence" in

the group.  The record shows that members stand for election to chapter officer positions, vote

for chapter officers, share testimonies or give Bible messages at Weekly Meetings, lead the

group in worship and prayer, mentor new pledges as part of the Big/Little Brother Program, hold

other members in Cell Groups accountable to living consistently with the group's Christian

beliefs, and act as its representatives of the fraternity to the wider campus community.  (First

Hoyt Dec. ¶ 46; Verified Second Am. Compl. Ex. A at 1-9.)  In short, the members dictate the message and direction of the group.

The Seventh Circuit Court of Appeals' holding in *Christian Legal Society v. Walker,* 453 F.3d 853 (7th Cir. 2006), turned in part on this distinction between membership and "mere presence" or attendance.  There, Southern Illinois University ("SIU") told the Christian Legal Society ("CLS") that to maintain recognition it needed to open its *membership* to persons that rejected its religious beliefs.  *Id.* at 863-64.  The Seventh Circuit held that SIU's actions violated CLS's expressive association rights, since they could "only be understood as intended to induce CLS *to alter its membership standards—not merely to allow attendance by nonmembers*—in order to maintain recognition."  *Id.* at 863 (emphasis added).

The same is true here.  UF is not simply demanding that BYX allow attendance or mere presence of non-Christians but rather demanding that BYX offer the full benefits and privileges of membership to non-Christians as a condition of registration.[1]  As in *Walker*, this sort of coercion by the government violates the right of expressive association.  *Id.* at 863-64.

    ii.  Even if UF's Constitutional Guidelines only require BYX to open its membership and not its leadership to non-Christians, the requirement nonetheless impairs BYX's expressive association.

UF's claim that its "Nondiscrimination Policy does not prohibit BYX from limiting its leadership positions to people who have demonstrated a credible profession of faith in Jesus Christ" is unfounded.  (Order Den. Mot. for Prelim. Inj. at 7.)  Nothing in the record compels the conclusion that the Constitutional Guidelines only prohibit discrimination in membership.  To the contrary, the Guidelines contain no such restriction and require a broad pledge of

---

  [1]  Indeed, UF specifically requires that every member of a registered student organization be given the power to elect and remove officers. (Verified Second Am. Compl. Ex. F at 18-19 & Ex. I at 1.)

nondiscrimination. (Verified Second Am. Compl. Ex. F at 18.) The Form Constitution passed

out by UF's Center for Student Activities and Involvement requires a blanket statement that

"[t]he organization, including all its members, will not discriminate against *anyone* . . . ."

(Verified Second Am. Compl. Ex. J (emphasis added).) UF's Nondiscrimination Policy, which

according to the University is applied to student organizations through the Constitutional

Guidelines (Defs.' Br. in Opp. to Pls.' Mot. for Prelim. Inj. at 3-4), claims that it "applies in all

areas to students." (Verified Second Am. Compl. Ex. F at 18.) There is every indication that UF

is just as concerned about whether a student group refuses to elect a student to leadership

because of creed as it is that a group denies membership to a student because of creed.

UF's claim is little more than a litigation tactic. (Defs.' Br. in Opp. to Pls.' Mot. for

Prelim. Inj. at 1.) It is a clear concession that compelling BYX to elect leaders who disagree

with the group's Christian beliefs is an unquestionable violation of the group's expressive

association rights. *Cf. Hsu v. Roslyn Union Free Sch. Dist. No. 3,* 85 F.3d 839, 862 (2d Cir.

1996) (holding that "the Hsus may try to preserve the content of the religious speech at their

meetings by discriminating in a way that ensures that the Club's leaders will be committed to

both its cause and a particular type of expression."). The mistake UF makes is to assume that its

obligation to comply with the First Amendment stops with leadership. In *California Democratic

Party v. Jones*, 530 U.S. 567 (2000), the Supreme Court held that a state primary law violated the

First Amendment because it forced "political parties to associate with—to have their nominees,

and hence their positions, determined by—those who, at best, have refused to affiliate with the

party, and, at worst, have expressly affiliated with a rival." *Id.* at 577. Similarly, in *Democratic

Party v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981), the Court overturned, on First

Amendment grounds, a state law that effectively required the National Democratic Party, in

violation of the party's rules, to allow non-party members to participate in the selection of the party's presidential nominee.  *Id.* at 125-26.  The Court observed that "the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves from intrusion by those with adverse political principles."  *Id.* at 122 (citations omitted).

The same is true here.  The chief privileges of membership in BYX are the ability to stand for election as an officer and to vote to elect the officers.  (First Hoyt Dec. ¶ 46; Verified Second Am. Compl. Ex. A at 1-9.)  UF is asking BYX to hold "open primaries," bestowing voting rights and the ability to run for office on anyone regardless of whether or not they share the group's Christian beliefs.  BYX has no guarantee that it can elect officers who will speak its message if it cannot limit the officers and voting members to persons who share its religious beliefs.  Just as the First Amendment allows political parties "to protect themselves from intrusion by those with adverse political principles," *La Follette*, 450 U.S. at 122, it also permits BYX to safeguard its message from intrusion by those with adverse religious beliefs.

        iii.      Supreme Court case law requires deference to BYX's understanding of the harm to its message.

In denying BYX's Motion for Preliminary Injunction, the Court stated that BYX had supplied "no evidence" that its expressive association rights were burdened.  (Order Den. Mot. for Prelim. Inj. at 6.)  But BYX's decision to forgo registration rather than accept leaders and members who reject its religious beliefs and viewpoints necessarily meant no further evidence developed.  BYX need not comply with UF's Constitutional Guidelines in order to challenge their constitutionality.  *Hays v. City of Urbana*, 104 F.3d 102, 103 (7th Cir. 1997) ("Long ago, the Supreme Court held that a person who must comply with a law or face sanctions has standing to challenge its application to him . . . ."); *see also Virginia v. American Booksellers Ass'n,* 484

U.S. 383, 393 (1988).  The Scouts in *Dale* were not compelled to retain Mr. Dale as scoutmaster to demonstrate the burden the antidiscrimination law imposed on their expressive association rights.  *Dale*, 530 U.S. at 653-54.   The Democratic Party need not comply with a blanket primary law to show that its associational rights would be burdened by allowing nonparty members to select the Party's candidates.  *La Follette*, 450 U.S. at 123-24; *Jones*, 530 U.S. at 581-82.

        The Court in *Dale* specifically directed federal courts to both "give deference to an association's assertions regarding the nature of its expression," and "give deference to an association's view of what would impair its expression."  *Dale*, 530 U.S. at 653; *see also La Follette*, 450 U.S. at 123-24 (considering whether a Wisconsin law burdened the National Party's associational rights and stating that "a State, or a court, may not constitutionally substitute its own judgment for that of the Party").   BYX has supplied clear evidence of its religious mission and the role of officers and members in achieving that mission.  Most fundamentally, officers and members are the students who control the group because they have the power to *lead* the group and *select* the leaders.  (First Hoyt Dec. ¶ 46; Verified Second Am. Compl. Ex. A at 1-9; Order Den. Mot. for Prelim. Inj. at 2.)  BYX has asserted its firm conviction "that in order to achieve its purposes and instill [Christian] values, it must require its members and officers to be male students and to have a personal relationship with Jesus Christ."  (Verified Second Am. Compl. ¶ 3.15.)  The Seventh Circuit rightly explained in *Walker*, 453 F.3d at 862-63, that it is self-evident—"[t]o ask this question is very nearly to answer it"—that requiring a religious student organization, like BYX, to hand over the power to lead and vote to students who disagree with its religious beliefs burdens the organization's expressive association.

iv.   The *Pi Lambda Phi* court specifically distinguished
a case like this one.

In *Pi Lambda Phi Fraternity v. University of Pittsburgh*, 229 F.3d 435 (3d Cir. 2000), the University stripped a fraternity of its status as a registered student organization after several of its members were arrested in a drug raid at the chapter's fraternity house.  *Id.* at 439-40.  The fraternity argued that the University's derecognition of the group violated its expressive association rights.  *Id.* at 442.  The Third Circuit held that the fraternity was not an expressive association and that, even if were, the University's actions were aimed at curtailing illegal drug activity, not at the fraternity's expression.  *Id.* at 444-47.

The Court specifically distinguished a case like this one where "a state law mandate[s] that [a] group accept members with whom the group d[oes] not want to associate."  *Id.* at 446. The Court explained:

> In the case at bar, the state action had neither a direct nor even an incidental effect on the Chapter's protected associational rights.  Unlike in *Dale*, the University's action does not require the Chapter to associate with anyone, nor is the regulation directed on its face at the Chapter's expressive or associational activities. . . . [T]he regulation was applied simply to the Chapter's drug activity.  The Chapter makes no claim that its members engaged in drug activity in order to communicate a political message, nor does it claim that there is any direct connection between its members' drug activity and their First Amendment expression.  Therefore, the University's action neither directly nor incidentally affected the Chapter's expressive interests.

*Id.* at 446-47.

Thus, this case is precisely the case the *Pi Lambda Phi* court recognized as a burden on expressive association rights.  UF's Constitutional Guidelines "mandate[] that [BYX] accept members with whom the group d[oes] not want to associate."  *Id.* at 446.  They require BYX to pledge in writing to open its leadership and membership to students who oppose the group's religious beliefs and viewpoints.  (Verified Second Am. Compl. ¶¶ 4.11-4.14 & Ex. F at 18.)

This is state action aimed directly at BYX's protected associational rights.

The more pertinent case is the Seventh Circuit's decision in *Walker,* 453 F.3d 853. There, SIU denied the Christian Legal Society the status and benefits of official university recognition because of the group's religious criteria for officers and members.  The Seventh Circuit held that "SIU's enforcement of its antidiscrimination policy upon penalty of derecognition can only be understood as intended to induce CLS to alter its membership standards . . . in order to maintain recognition."  *Id.* at 863.  Application of the antidiscrimination policy in this way "burdens CLS's ability to express its ideas."  *Id.*  In the same way, UF's denial of registration to BYX because it requires leaders and members to share its religious beliefs runs afoul of the right of expressive association.

>v.     The Court's Order Denying Preliminary Injunction impermissibly forces BYX to choose between registering with the University and maintaining its integrity and religious identity.

The First Amendment does not allow UF to force BYX to forfeit either its identity or its integrity.  Yet the crux of this Court's decision is that there is no burden on BYX's expressive association rights because "there is no actual person being considered for membership."  (Order Den. Mot. for Prelim. Inj. at 7 n.2.)  This ruling places BYX in an untenable position: either BYX will never exist as a registered student organization, or BYX must intentionally place an untrue statement in its constitution and thereby create testimony against itself that undermines any future expressive association or free exercise claims.

Specifically, if BYX does not include the "religion" and "creed" portions of the Nondiscrimination Statement in its constitution, it cannot exist as a registered student organization.  If in order to be registered, however, BYX does include "religion" and "creed" in its Nondiscrimination Statement, it will have defined itself (under coercion by the state) as a

group that *allows* members who do not share its religious beliefs and Code of Conduct. Thus, when a non-Christian actually does seek membership, as anticipated by the Court, BYX will have neither an expressive association nor a free exercise claim, because its constitution will define it as a group that *allows* such members to join. Thus, the Court's decision forces BYX effectively to testify against itself by creating evidence that will be used to undermine its expressive association and free exercise claims. Additionally, BYX will be forced to admit that it lied when it said in its constitution that it does not use religion as a criterion for membership. Forcing BYX to choose between registering with UF and protecting its identity and integrity is precisely the sort of governmental coercion the First Amendment was intended to protect against. *Bourgeois v. Peters*, 387 F.3d 1303, 1324-25 (11th Cir. 2004).

      B.      UF's Denial of Registration to BYX is Viewpoint Discriminatory.

Viewpoint discrimination violates free speech regardless of the forum. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390-92 (1993); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985). Here, UF engages in viewpoint discrimination in two ways. First, UF forbids student groups to organize around religious ideals, but allows student groups to organize around other ideals. For example, the Pro-Life Alliance can tell voting members they must support the organization's purposes and pro-life philosophy. (Verified Second Am. Compl. Ex. E at 12; First Tracey Dec. Ex. G.) And the Albanian Student Association can require members to agree with the group's beliefs about Albanian culture. (Verified Second Am. Compl. Ex. E at 2; First Tracey Dec. Ex. E.) In each case, UF allows the groups to discriminate on the basis of shared personal beliefs or creed.

UF, however, forbids religious clubs, like BYX, from requiring their members to affirm a common set of religious beliefs. To prohibit religious student groups from using religious

criteria in their membership practices, while allowing other groups to select members that
support their mission and objectives, is religious viewpoint discrimination.  *Rosenberger v.
Rector of the Univ. of Virginia*, 515 U.S. 819, 826, 831-32 (1995); *Lamb's Chapel,* 508 U.S. at
394; *Good News Club v. Milford Central Sch.,* 533 U.S. 98, 109 (2001).

Second, UF regularly permits other registered student organizations to discriminate on
grounds forbidden by the policy.  Although prohibited by the University's Nondiscrimination
Policy, UF exempts groups, such as fraternities and sororities, from the ban on sex
discrimination.  (Second Am. Compl. Ex. M at 2-3.)  UF's Constitutional Guidelines also
expressly state that student organizations are "*not* required to include sexual orientation" in their
nondiscrimination statements even though sexual orientation discrimination is forbidden by the
Nondiscrimination Policy.  (Verified Second Am. Compl. ¶ 4.14 & Ex. F at 18 (emphasis
added).)

Moreover, the University registers groups that clearly state in their constitutions that they
intend to discriminate in violation of the University's Nondiscrimination Policy.  The Baha'i
Association seeks members who assent to its religious principles and purposes.  (Verified Second
Am. Compl. Ex. E at 3; First Tracey Dec. Ex. A.)  Alpha Epsilon Pi is a Jewish fraternity that
mandates that members profess a belief in God.  (Verified Second Am. Compl. Ex. E at 2; First
Tracey Dec. Ex. B.)  Christian Pharmacists Fellowship International requires members to agree
with their Christian beliefs and to affirm faith in Jesus Christ.  (Verified Second Am. Compl. Ex.
E at 4; First Tracey Dec. Exs. C & D.)

In *Walker,* 453 F.3d 853, the Seventh Circuit found viewpoint discrimination because the
University was allowing "other recognized student organizations [to] discriminate in their
membership requirements on grounds prohibited by SIU's policy."  Likewise, the Court in *Boy*

*Scouts of America v. Till,* 136 F Supp. 2d 1295 (S.D.  Fla. 2001), held that the School Board's exclusion of the Boy Scouts was viewpoint discriminatory, because the Board regularly allowed access to other community groups—for instance, sororities, churches, and cultural groups—that discriminated on bases enumerated in the Board's anti-discrimination policy.  *Id.* at 1303-04. *See also Truth v. Kent Sch. Dist.,* 524 F.3d 957, 973 (9th Cir. 2008) (reversing grant of summary judgment to District where "[t]here is evidence in the record that other groups were granted ASB recognition despite violating the District's non-discrimination policy").  UF's uneven application of its policy in this case is likewise viewpoint discriminatory.

C.      UF Fails to Satisfy Strict Scrutiny.

UF's infringement of BYX's First Amendment rights is subject to strict scrutiny.  *Dale*, 530 U.S. at 648 (regulation must "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through a means significantly less restrictive of associational freedoms"); *Healy*, 408 U.S. at 184 (a "'heavy burden' rests on the college" to demonstrate the appropriateness of denying recognition).  To satisfy strict scrutiny, UF must show that application of its Constitutional Guidelines to deny BYX registration is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Widmar v. Vincent,* 454 U.S. 263, 270 (1981).

1.      UF lacks a compelling interest.

There is no compelling state interest in preventing religious discrimination on the part of religious groups.  Nondiscrimination laws prohibit discrimination because the prohibited characteristic is legally irrelevant to the protected individuals' ability to, for instance, own a home, 42 U.S.C. § 3604(a) (2007), or be a capable employee, 42 U.S.C. § 2000e-1 (2007).

16

Thus, UF's Constitutional Guidelines should be applied to prohibit discrimination when protected characteristics are irrelevant to a student's ability to serve as an officer or member of a particular student organization.  While religious beliefs may be irrelevant to one's ability to serve as a leader or member of the Florida Swing Dancing Club or the University Chess Club, these religious qualifications are highly relevant to an individual's ability to serve as a faithful leader or member of a religious student organization, like BYX.  UF advances the purpose of its nondiscrimination policy when it bars the Florida Swing Dancing Club or the University Chess Club from discriminating on the basis of religion, but not so when it does the same to religious groups.  The critical relevance of religious belief to the mission of religious groups, like BYX, changes the nature of religious leadership and membership decisions altogether, and means that decisions based on religious criteria are not properly considered "discrimination."

The Second Circuit recognized the distinction in *Hsu,* 85 F.3d 839, observing:

> A religious-based exclusion would have different meanings in different groups.  A hypothetical chess club that excluded Muslims could not claim that the exclusion was necessary to guarantee committed chess players.  The Hsus' insistence on the exclusion of non-Christians from leadership positions, however, is not a matter of prejudice or clique, just as the girls soccer team at Roslyn High probably does not exclude boys out of enmity.  The exclusion in both instances serves a legitimate self-definitional goal for the group.  This essential and direct link between the legitimate purpose of the club and the principle of exclusion necessary to achieve that purpose distinguishes the girls soccer team and the Walking on Water Club from the hypothetical Chess Club.

*Id.* at 861 n.20.

For this very reason, federal and state nondiscrimination laws generally exempt religious organizations.  For example, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), which forbids covered employers from discriminating on the basis of religion, explicitly permits religious organizations to take religion into account in their employment decisions.  Florida's state employment nondiscrimination law similarly exempts religious employers from the ban on

religious discrimination.  Fla. Stat. Ann. § 760.10(9) (2008).

Similarly, the "direct link" between BYX's religious purpose and the exclusions necessary to achieve that purpose distinguish BYX's use of religion from how the Florida Swing Dancing Club or the University Chess Club might use religion.  Indeed, this direct relevance of religious belief to a religious group's ability to exist means that UF's actions would not even meet a reasonable basis standard, let alone the applicable compelling interest standard.

> 2.     UF has not chosen the least restrictive means of pursuing its interest.

UF can pursue its goal of prohibiting discrimination without denying BYX recognition. Indeed, recognition of BYX increases the diversity of religious viewpoints on campus and protects the right of minority religious groups to maintain their identity.  Instead the least restrictive means of pursuing diversity on campus and protecting religious minorities is to exempt religious organizations from the policy's prohibition of religious discrimination.

 Recognizing the disconnect between the goal of  diversity and prohibitions on religious membership and leadership decisions by religious student groups, a number of public universities have exempted religious student organizations from nondiscrimination policies and granted them official recognition.  For example, The Ohio State University provides: "Student organizations formed to foster or affirm the sincerely held religious beliefs of their members may adopt a nondiscrimination statement that is consistent with those beliefs."  Student Organization Registration Guidelines, at 5 (2008-2009), available at http://ohiounion.osu.edu/posts/documents /Student%20Org%20Registration%20Guidelines_08-09.pdf.  Likewise, the University of Minnesota provides: "Religious student organizations may require their voting membership and officers to adhere to the organization's statement of faith and its rules of conduct."  University of Minnesota Constitution Writing Guide (2008-2009), available at http://www.sua.umn.edu/

groups/start/constitution-guide.php.  Thus, the least restrictive means requirement is met only if UF exempts religious student organizations from its Guidelines' prohibition on religious discrimination.

      II.      Plaintiffs Have Suffered and Continue to Suffer Irreparable Harm.

Federal courts in the Eleventh Circuit "presume[] irreparable harm to a plaintiff when certain core rights are violated." *Touchston*, 234 F.3d at 1159 n.4.  The Court of Appeals has made clear that these "core rights" include those protected by the First Amendment.  For example, in *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983), the Eleventh Circuit issued a preliminary injunction against the State and specifically held that "the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Id.* at 1188, *quoting Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion).  BYX has shown that UF's denial of registration violates the group's First Amendment rights.  Thus, "irreparable harm is presumed and no further showing of injury need be made." *Touchston,* 234 F.3d at 1158-59.

The wisdom of *Elrod v. Burns,* 427 U.S. 347, and *Cate v. Oldham*, 707 F.2d 1176, in presuming irreparable harm is demonstrated by the results of UF's denial of BYX's constitutional rights.  Without registration, BYX's efforts at recruiting new pledges are significantly hindered.  (First Peterman Dec. ¶¶ 4, 5, 6, & 7.)   BYX has no guaranteed access to campus facilities where it can host meetings or activities.  (First Peterman Dec. ¶¶ 5, 8, 10, 11; Verified Second Am. Compl. Ex. F at 9, 36.)  BYX has thus been forced to hold many of its activities and meetings off-campus.  (First Peterman Dec. ¶ 14.)  This makes it particularly difficult to recruit freshmen, since most freshmen do not have cars and those that do have cars

are too unfamiliar with Gainesville to easily locate off-campus meetings and events.  (First Peterman Dec. ¶ 8.)

BYX is also unable to advertise in the same manner as registered student organizations. It is excluded from UF's lists of student organizations both in hard copy and on-line.  It is precluded from setting up and staffing tables at the J. Wayne Reitz Union, Turlington Plaza, and Library West.  It cannot participate in the annual Student Organization Fairs.  It cannot hang banners in the Plaza of the Americas or in front of the J. Wayne Reitz Union.  It cannot use University web space to host a student organization website.  And it is limited to posting fliers on bulletin boards open to the general public.  (First Peterman Dec. ¶¶ 10-13; Verified Second Am. Compl. ¶ 4.4.)

The inability to hold regular events and meetings on campus and the denial of the channels of communication typically used by student organizations meant that BYX was only able to recruit three new pledges during the Fall 2007 rush period.  (First Peterman Dec. ¶ 3.) The recognized Christian Greek organizations, Sigma Phi Lambda and Kappa Upsilon Chi, were able to recruit fifty-four and eighteen pledges respectively during this same period.  (First Peterman Dec. ¶ 6.)

The 2008-2009 academic year begins on August 21, 2008.  UF Academic Calendar, available at http://www.registrar.ufl.edu/catalog/adfall0809.html.  The rush period is always the beginning of the semester.  (First Peterman Dec. ¶¶ 4, 7.)  If BYX is not registered far enough in advance of the start of the Fall 2008 semester, its efforts at recruitment will continue to suffer. As the Supreme Court has stated, "[d]enial of official recognition pose[s] serious problems for [a student] organization's existence and growth," and thus constitutes irreparable harm.  *Healy,* 408 U.S. at 176.

III.    The Injury to BYX Outweighs Whatever Damage the Proposed Injunction
        May Cause to UF.

UF will suffer no harm if this Court issues an injunction pending appeal.  UF registers

over 700 student organizations each academic year.   Almost 40 of these organizations are

religious student organizations.  Groups similar to BYX, such as Kappa Upsilon Chi and Sigma

Phi Lambda, have been recognized for the past three academic years.  To add one more student

organization to the list of hundreds of student organizations will have little impact on UF's

student organization system.

IV.    The Issuance of an Injunction Pending Appeal is in the Public Interest.

"[I]t is always in the public interest to protect First Amendment liberties."  *KH Outdoor,*

*LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006), *quoting Joelner v. Vill. of*

*Washington Park,* 378 F.3d 613, 620 (7th Cir. 2004).  These constitutional protections of the

First Amendment are "nowhere more vital than in our schools and universities."  *Kleindienst v.*

*Mandel*, 408 U.S. 753, 763 (1972) (internal citations and quotations omitted).  The issuance of an

injunction in this case would uphold the First Amendment rights of free speech and association

and educate people on the importance of these rights.  As the *Till* court stated, "[E]njoining a

selective denial of a dedicated public forum to a group because of its membership policies would

forward and not contravene the public interest."  *Till,* 136 F. Supp. 2d at 1311.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that this Court grant their Emergency Motion

for an Injunction Pending Appeal.

Respectfully submitted this 6th day of June, 2008.

s/ Timothy J. Tracey
Timothy J. Tracey (GA Bar No. 715195)

Isaac J. Fong (CA Bar No. 250242)
CENTER FOR LAW & RELIGIOUS FREEDOM
8001 Braddock Road, Suite 300
Springfield, VA  22151-2110
Tel: (703) 642-1070
Fax: (703) 642-1075

Roger K. Gannam (Fla. Bar No. 240450)
LINDELL FARSON & PINCKET, P.A.
12276 San Jose Boulevard, Suite 126
Jacksonville, FL  32223
Tel: (904) 880-4000
Fax: (904) 880-4013

OF COUNSEL:

Benjamin W. Bull. (AZ Bar No. 009940)
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, Arizona 85260
Tel: (800) 835-5233
Fax: (480) 444-0028

Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing PLAINTIFFS' MEMORANDUM IN SUPPORT OF

EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL was electronically filed

through the district court's ECF system and, pursuant to N.D. Fla. Loc. R. 5.1(A)(6), was thereby

served by Notice of Electronic Filing upon the following:

    H. Christopher Bartolomucci
    HOGAN & HARTSON LLP
    555 13th Street NW
    Washington, DC  20004-1109
    hbartolomucci@hhlaw.com

    Jake Marvin Shields
    HOGAN & HARTSON LLP
    555 13th Street NW
    Washington, DC  20004-1109
    jmshields@hhlaw.com

This 6th day of June, 2008.

           s/ Timothy J. Tracey
           Timothy J. Tracey
           CENTER FOR LAW
             & RELIGIOUS FREEDOM
           8001 Braddock Road, Suite 300
           Springfield, VA 22151-2110
           (703) 642-1070

.